IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

In Re:                              *        Case No.  24-31033

YZ Enterprises Inc.
                                    *        Judge John Gustafson
                                             Chapter 11 Proceeding, Subchapter V
                 Debtor
                                    *

           *                        *                          *


_____

**DEBTOR'S CHAPTER 11 PLAN UNDER SUBCHAPTER V OF TITLE
11 OF THE UNITED STATES CODE**
_____


Eric R. Neuman (0069794)
DILLER & RICE
1107 Adams Street
Toledo, Ohio 43604
Phone: (419) 724-9047
eric@drlawllc.com

ATTORNEY FOR DEBTOR

1

This Plan ("Plan") is being filed by the Debtor, YZ Enterprises Inc., (hereinafter the "Debtor"), pursuant to Subchapter V of Title 11 of the United States Bankruptcy Code. This Plan is Three (3) years in length.

**Background**

**A. Description and History of the Debtor's Business**

The Debtor, YZ Enterprises, was founded in 1989 by Yuval and Susan Zaliouk. ("Zaliouks"). The Debtor operates under the trade name of Almondia.

Yuval and Susan Zaliouk are each 50% owners of the Debtor. Management of the Debtor is done through Tamar Markham, who is CEO of the Debtor. Mrs. Markham is also the daughter of the Zaliouks. Mrs. Markham's husband, Jason Markham, is also involved in the Debtor's business operations and is an officer of the Debtor.

The Debtor's business operations consists of the manufacture of various types of cookies and like delicacies. The recipes for the Debtor's products are trade secrets. The original Almondina cookie stems from a recipe handed down to Mr. Zaliouk by his grandmother. Mr. Zaliouk's love for his grandmother's cookies is what inspired him to start the Debtor's business operations.

Since its inception, the Debtor has grown to handle more and more customers, both retail and direct to consumer sales. Its customers include Kazmaier's, Walt Churchill Market and Sofo Foods. For this purpose, the Debtor's business operations consist of three overall production lines.

First is the Debtor's Core Line in which it produces on average 9,000 packs of products per day. Second, is the Debtor's Toastees line in which it produces on average 6,500 packs per day. Finally, the Debtor manufactures products for a third party, Nonni, under which it produces on average 7,000 to 8,000 bags per day.

At present, the Debtor's gross monthly revenue is approximately $125,000.00 per month. On the expense side of the equation, the Debtor's operating expenses are approximately $119,000.00 per month which includes payroll and the cost of inputs. The Debtor currently has 15 employees, but this number fluctuates depending on need. Traditionally, the Debtor has employed 20 to 25 people. Six of the Debtor's employees, including Mr. and Mrs. Markham, work as office personnel; the other employees work on the Debtor's production line. The Zailiouks are not employed by the Debtor; nor do they receive any compensation.[1]

The Debtor does not own any real property, but leases its manufacturing facility from Suval Investments. ("Suval"). This facility is located at 1930 Indian Wood Circle Maumee, Ohio. The facility is 17,941 square feet. The monthly rental for the facility is $3,000.00. The

---

[1] Prior to the commencement of the case, the Debtor paid, for Mr. Zailiouk, for the lease of a Lexus 350 Sport under which the Debtor is lessee. Since the commencement of the case, Mr. Zailiouk is personally paying this lease.

Debtor believes that this rent is under market value. Mr. and Mrs. Markham are the sole members off Suval.

The Debtor's production of its products consists of taking raw materials, then producing its products and then packaging its products for shipment to its customers. To this end, the Debtor's personal property consists of that property used to manufacture its products and may be generally divided into the following categories: (1) cash and accounts receivable; (2) inventory; (3) equipment; (4) intellectual property; and (5) miscellaneous property. Prior to filing, the Debtor had factored most of its accounts with Franklin Capital Holdings, LLC. At the time of filing, Franklin Capital maintained approximately $22,000.00 in outstanding accounts receivable which the Debtor had factored.

The Debtor's inventory consists of raw materials, work in progress, finished products, and packaging materials. However, because these products are either perishable or unique to the Debtor's business, their liquidation value is minimal.

The Debtor's equipment consists of all that property necessary to produce and package its products. Prior to the filing of the case, the Debtor obtained an appraisal of its equipment which showed that its equipment had a fair market value of $299,000.00 and a liquidation value of $154,000.00. Some of this equipment, however, is subject to the claims of particular creditors. In particular, a bagging system with a fair market value of $100,00.00, is subject to a claim of Amur Equipment Finance. In addition, a cartoner machine, with a fair market value of $50,000.00, is subject to claim of Pawnee leasing. Certain other equipment, such as a bowlift, forklift and air compressor, are also subject to the claims of particular creditors.

The Debtor's intellectual property consists of trade secrets and trademarks for its products. The value of the property is undeterminable. Finally, the Debtor's property consists of certain miscellaneous items, of minimal value, such as office furniture and electronic equipment.

When the Debtor sought bankruptcy relief, four creditors had filed UCC-1 financing statements, claiming an interest in substantially all of the Debtor's property. In order of priority, these creditors are:

| Creditor | Est. Claim Amount |
| --- | --- |
| Northview Capital LLC | $225,000.00 |
| Franklin Capital Holdings LLC | $22,000.00 |
| SBA | $2,000,000.00 |
| Unique Funding | $94,000.00 |
| ODK Capital LLC | $275,935.16 |

| | |
|---|---|
| TVT Capital | $30,000.00 |
| Channel Partners | $175,000.00 |

Except for Northview Capital, the Debtor believes that the other creditors listed above are unsecured creditors for purposes of bankruptcy law, 11 U.S.C. § 506. In addition, the following creditors claim an interest in specific property of the Debtor:

| Creditor | Property | Basis |
|---|---|---|
| De Lage Laden Financial Services | Bowlift | Lease w/ option to purchase |
| Lexus of Toledo | Lexus 350 Sport | Lease |
| Miami Industrial Trucks | Forklift | Lease w/ option to purchase |
| Wells Fargo | IR Air Compressor | Lease w/ option to purchase |

Including the claims of Franklin Capital Holdings, the SBA and Unique Funding, the Debtor disclosed that at the commencement of the bankruptcy case it had $3,467,085.45 in unsecured debt. Most of this unsecured debt is general unsecured debt, incurred in the normal course of the Debtor's business operations, but a small amount does include priority unsecured debt with the Debtor owing Mr. and Mrs. Markham $45,200 for unpaid wages of which $6,139.90 is priority debt under 11 U.S.C. § 507(a)(4). The Debtor does not believe that it owes any back taxes. In addition, the Debtor's unsecured debt includes a claim for Suval Investments of $181,100.00 for unpaid rent at the Debtor's production facility located at 1930 Indian Wood Circle, Maumee, Ohio.

The Debtor's income and expenses for the most recent years has been as follows:

| Year | Gross Income[2] | Expenses | Net |
|---|---|---|---|
| 2024 | $680,141.00 | $859,505.00 | ($179,363.65) |
| 2023 | $1,620,637.77 | $2,278,413.61 | ($657,775.39) |
| 2022 | $1,594,637.28 | $2,520,538.29 | ($925,901.31) |

The Debtor's most recent operating report filed with the Court for the month of June showed as follows;

---

[2]Through 6-30-2024. The expense figure, however, doesn't reflect that Nonnis, a major customer of the Debtor, started in July of this year to pay for its own ingredients and packaging. This will significantly reduce the Debtor's Expenses.

4

| Income | Expenses | Net |
|--------|----------|-----|
| $123,847.48 | $132,549.09 | ($9,057.61) |

The Debtor's financial difficulties started a number of years ago when it purchased over one million dollars in equipment that did not work properly. While the Debtor was eventually able to rectify its issue with the equipment and the seller of the equipment, this circumstance negatively affected the Debtor's business operations going forward. However, the primary event which precipitated the Debtor's current financial difficulties and which eventually necessitated the filing of the bankruptcy case, arose when it lost its primary customer, Trader Joe's.

Trader Joe's had been especially important for the Debtor's business operations as not only was it the Debtor's primary customer, constituting approximately 40% of the Debtor's sales, but Trader Joe's paid by ACH with 5 day terms. COVID also negatively affected the Debtor's business operations with many of its customers insisting on paying on net 60 terms rather than net 30 terms. Finally, after COVID, the Debtor had significant problems finding and retaining production personnel, making it difficult and at times impossible for the Debtor to meet its production needs.

To improve sales, the Debtor has, in recent months, shifted its majority focus to co-manufacturing for other customers – Nonni's being the number one customer. Nonni's is aware of the Debtor's reorganizational efforts and has been supportive in this process. Nonni's has also partnered with the Debtor to assistant the Debtor in implementing methods which help with efficiency and gains in daily output. In addition to Nonni's, the Debtor also has many new Almondina customers in the pipeline.

Based upon the forgoing, the Debtor believes that it can successfully operate, on a forward going basis, as a profitable company. However, to do so, its current debt structure needs to be reorganized, thus necessitating the filing of this Chapter 11 case.

**B. Liquidation Analysis**

To confirm the Plan, the Bankruptcy Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity-interest holders would receive in a chapter 7 liquidation. The liquidation analysis required by 11 U.S.C. § 1190 is attached to the Plan as Exhibit A. Under the Liquidation Analysis, general unsecured creditors would receive $0.00 if this case were to proceed under Chapter 7 of the United States Bankruptcy Code.

**C. Ability to Make Future Plan Payments and Operate Without Further Reorganization**

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the Debtor's business. The Plan Proponent's financial projections show that the Debtor will have total projected disposable income (as

defined by § 1191(d) of the Bankruptcy Code) for the three (3) year term of this Plan of $78,887.11. Attached hereto as Exhibit B are the Debtors financial projections. ("Budget").

The final Plan payment is expected to be paid on the Third Anniversary from the Effective Date of this Plan.

## ARTICLE 1: SUMMARY

This Plan of Reorganization under chapter 11 of the Bankruptcy Code (the "Code") proposes to pay creditors of the Debtors from its Disposable Income.

This Plan provides for:

      1 class of priority claims;
      8 classes of secured claims;
      1 class of non-priority unsecured claims; and
      1 class of equity interest.

**Payment of non-priority unsecured claims.** Non-priority unsecured creditors holding allowed claims will receive an estimated distributions over the length of this Plan of $78,887.11 ("Total Disposable Income") which the proponent of this Plan has valued at approximately 2.3 cents on the dollar. These figures are based upon the following figures:

| | |
|---|---|
| Total Disposable Income in Plan | $78,887.11 |
| Administrative Expenses | $20,000.00 (est.) |
| Priority Claims | $6,139.90 |
| Total general unsecured claims | $3,460,945.55 |

**Please note that the above claim amounts are only estimates.**

**Payment of administrative expenses and priority claims:** This Plan provides for full payment of administrative expenses and priority claims. All creditors should refer to Articles 3 through 8 of this Plan for information regarding the precise treatment of their claim.

***Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)***

## ARTICLE 2: CLASSIFICATION OF CLAIMS AND INTERESTS

### 2.01: Class 1. Priority Claims

This class consists of all allowed claims entitled to priority under § 507(a) of the Code (except administrative expenses under § 507(a)(2) ["gap" period claims in an involuntary case under § 507(a)(3),] and priority tax claims under § 507(a)(8)).

### 2.02: Class 2. Secured Claim of Northview Capital, LLC

6

This Class consists of the Secured Claim of Northview Capital

**2.03: Class 3. Secured Claim of United States Small Business Administration**

This Class consists of the Claim of United States Small Business Administration.

**2.04: Class 4. Secured Claim of Franklin Capital Holdings.**

This Class consists of the Claim of Franklin Capital Holding

**2.05: Class 5. Putative Secured Claims of MCA Creditors**

This Class consists of the Putative Secured Claims of Creditors making Merchant Cash Advances, or other similar extension of credit to the Debtor.

**2.06: Class 6. Secured Claim of Cardiff/Amur**

This Class consists of the Secured Claim of Cardiff Inc./Amur Equipment Finance, Inc.

**2.07: Class 7. Secured Claim of Pawnee Leasing Corporation**

This Class consists of the Secured Claim of Pawnee Leasing Corporation.

**2.08: Class 8. Secured Claim of Bapu Almond Company, Inc.**

This class consists of the Secured Claim of Bapu Almond Company, Inc.

**2.09: Class 9. Miscellaneous Secured Claims**

This Class consists of any allowed secured claim that is not otherwise separately classified in this Plan.

**2.10: Class 10. General Unsecured Claims**

This Class consists of all non-priority unsecured claims not otherwise classified and allowed under § 502 of the Code.

**2.11 Class 11. Equity Interest**

This Class consists of the equity interests held by the Zaliouks in the Debtor

**ARTICLE 3: TREATMENT OF ADMINISTRATIVE EXPENSES, PRIORITY TAX CLAIMS, AND QUARTERLY AND COURT FEES**

**3.01: Unclassified claims.**

Under section § 1123(a)(1), allowed administrative expenses ["gap" period claims in an involuntary case allowed under § 502(f) of the code,] and priority tax claims are not in classes.

**3.02: Administrative expenses.**

If this Plan is consensually confirmed pursuant to § 1191 of the Code, Administrative expenses allowed under § 503 of the Code [and a "gap" claim in an involuntary case allowed under § 502(f) of the Code,] will be paid in full on the later of Effective Date of this Plan or when such claim arises, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor.

Except if provided otherwise in this Plan, if this Plan is not consensually confirmed pursuant to § 1191 of the Code, administrative expenses allowed under § 503 of the Code [and a "gap" claim in an involuntary case allowed under § 502(f) of the Code,] will be paid as follows consistent with section 1191(e) of the Code:

| Type | Treatment |
| --- | --- |
| Expenses arising in the ordinary course of business after the Petition Date | Paid in full on the Effective Date, or according to the terms of the obligation, if later. |
| Administrative Tax Claim | Consistent with § 1191(e) of the Code, such claims will be paid pro-rata, on a monthly basis, with other administrative claims and in the order of priority set forth in §§ 503 and 507 of the Code. |
| The value of goods received in the ordinary course of business within 20 days before the Petition Date.<br><br>On August 2, 2024, PPC Flexible Packaging filed a motion for the allowance of an administrative claim in the amount of $31,689.99. (Doc. No. 60). To the extent allowed by the Court, and in the amount requested, such claim shall be subject to the treatment provided herein and shall be paid at the rate | Consistent with § 1191(e) of the Code, such claims will be paid pro-rata, on a monthly basis, with other administrative claims and in the order of priority set forth in §§ 503 and 507 of the Code. |

8

| | |
|---|---|
| of $880.28 per month. | |
| Professional fees, including fees of Trustee and Debtor's counsel, as approved by the Bankruptcy Court. | Consistent with § 1191(e) of the Code, such claims will be paid pro-rata, on a monthly basis, with other administrative claims and in the order of priority set forth in §§ 503 and 507 of the Code. |
| Other Administrative Expenses | Consistent with § 1191(e) of the Code, such claims will be paid pro-rata, on a monthly basis, with other administrative claims and in the order of priority set forth in §§ 503 and 507 of the Code. |

**3.03: Priority tax claims.**

Unless it agrees to a different treatment with respect to its claim, and except as provided and specified in this Plan, each holder of an allowed priority tax claim entitled to priority under Section 507(a)(8) of the Bankruptcy Code shall be paid in cash, in full, on the Effective Date; provided, however, (a) the Debtor reserves the right to elect that holders of such Allowed Tax Claims receive cash payments deferred to the extent permitted by Section 1129(a)(9)(C) of the Code and, in such event, interest shall be paid on that portion of such Allowed Tax Claim at a rate to be agreed to by the Debtor and the appropriate governmental unit or, if they are unable to agree, to be determined by the Bankruptcy Court; and (b) if such Allowed Tax Claim is for tax assessed against property of the Estate, such Claim does not exceed the value of the interest of the Estate in such property. Claims in this Class shall be entitled to receive payment (1) ahead of general unsecured claims as provided for in this Plan, and (2) in accordance with the order of priority set forth in § 507 of the Bankruptcy Code.

In this case, the IRS filed a proof of claim, claiming a priority claim in the amount of $16,155.57. (Cl. No, 6). All but $16.48 of this claim, however, is based up estimates for taxes due in 2024. The Debtor submits that these liabilities will be paid in the ordinary course of the Debtor's business operations. Notwithstanding, if any priority tax claim is not paid, as set forth in the IRS proof of claim, the Debtor elects to pay its priority tax claims over the length of this Plan in accordance with 11 U.S.C. § 1129(a)(9)(C).

**ARTICLE 4: TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

**4.01: Claims and interests are treated as follows under this Plan:**

**Class 1 – Priority claims**

This Class consists of all allowed priority claims under § 507 of the Code except those in Article 3 of the Plan. The Debtor believes that the following claims exist in this Class:

| Claimant | Amount of Priority Claim | Basis |
|---|---|---|
| Tamar Markham | $1,800.00 | Compensation (§ 507(a)(4)) |
| Jason Markham | $4,339.90 | Compensation (§ 507(a)(4)) |
| Total | $6,139.90 | |

The above claims were not listed in the Debtor's bankruptcy schedules as contingent, unliquidated or disputed. Pursuant to Bankruptcy Rule 3003, such claims shall be allowed in the above amounts unless otherwise allowed in a different amount by the Court or such claimant files a proof of claim and such claim is allowed in which case such claimant shall be paid according to the treatment in this Class on the allowed amount of the claimant's priority claim.

**Claims in this Class are Impaired and are entitled to Vote on this Plan.**

Treatment

Unless a claimant agrees to a different treatment, any claimant holding an allowed claim in this Class shall be entitled to be paid in full, in deferred payments, on the allowed amount of their claim over the length of this Plan.

Such payments shall be paid in equal quarterly installments over the length of this Plan. The Debtor shall commence making such payments on the fifth day of the month following the Effective Date of this Plan, unless such date fall on a Saturday or Sunday or other federal holiday in which case such payment shall be due on the first day thereafter. Such distributions shall be made in accordance with the order of priority set forth in § 507(a) of the Code.

Unless the respective claimant's priority claim is allowed in a different amount, quarterly payments due to such claimant's priority claim shall be as follows:

| Claimant | Quarterly Payment |
|---|---|
| Tamar Markham | $150.00 |
| Jason Markham | $361.66 |

**Class 2 –Secured of Northview Capital, LLC ("Northview")**

In February of 2023, the Debtor entered into a financial transaction with Northview. ("Northview Loan"). Under the documents for the Northview Loan, said loan was structured as

10

an Equipment Lease. ("Northview Documents"). Under the Northview Loan, Northview lent to the Debtor the sum of $300,000.00. The Zaliouks personally guaranteed the Northview Loan.

The term of the Northview Loan was four years in length, with monthly payments due under the Northview Loan set at 2.75780% of the Loan Amount. To secure its obligation under the Northview Loan, the Debtor granted to Northview a security interest in substantially all of its property. ("Northview Security Interest"). At the commencement of the case, the United States Small Business Administration also held an security interest in substantially all of the Debtor's property, but this interest was subordinated to the Northview Security Interest.

**The Claim in this Class is Impaired and entitled to Vote on this Plan.**

<u>Treatment</u>

Under this Plan, Northview's Claim with respect to the Northview Loan and Northview Security Interest shall be deemed to be fully secured for purposes of 11 U.S.C. § 506(a). ("Secured Claim"). The Secured Claim shall attach to the Debtor's property to the same extent and in the same priority provided for under the Northview Loan Documents, the Northview Security Interest and applicable law.

Northview filed a proof of claim in this in the amount $274,026.99. (Cl. 4-1). The allowed Secured Claim of Northview shall be allowed in the amount filed, including any amendments thereto, or in such amount as the Bankruptcy Court, upon objection of a party in interest, determines the allowed amount of the Secured Claim.

Notwithstanding the foregoing, the allowed amount of the Secured Claim of Northview shall be subject to the following: All adequate protection payments made to Northview, pursuant to cash collateral orders entered by the Bankruptcy Court, shall be applied as payments toward its claim in accordance with and pursuant to the Northview Loan Documents.

The allowed Secured Claim shall be modified, as provided in 11 U.S.C. § 1123(b)(5), as follows:

Pursuant to 11 U.S.C. § 1123(a)(5)(H), the Northview Loan and the amount due on the allowed amount of the Secured Claim of Northview shall be amortized over a period of eight years and eight months commencing from the Effective Date of the Plan. Interest due on the allowed amount of Secured Claim of Northview shall be 10.5% per annum. Unless the Northview Secured Claim is allowed in a different amount, monthly payments due on the Northview Secured Claim shall be in the amount of $4,000.00.

Notwithstanding, after 36 months, commencing from the Effective Date, the amount remaining due and owing on the Northview Secured Claim shall balloon and become fully due and payable and Northview shall, at that time, be entitled to enforce all rights it has against the

Reorganized Debtor and its Property in accordance with the Northview Documents and applicable law.

Payments shall be made on the allowed amount of the Secured Claim of Northview on a bi-monthly basis, with a payment of $2,000.00 due on the 5th day of every month and an additional payment of $2,000.00 due on the 20th day of every month, unless such dates fall on a Saturday or Sunday, or other federal holiday in which case such payment shall be due on the first business day thereafter. Monthly payments to Northview shall commence on the 5th day of the month following the Effective Date of the Plan.

Payments on the Northview Secured Claim shall be paid by the Debtor notwithstanding that this Plan is not consensually confirmed under 11 U.S.C. § 1191.

Pursuant to 11 U.S.C. § 1191(1), until the allowed amount of Northview's Secured Claim is fully paid, the Debtor shall not be discharged with respect to the allowed amount of Secured Claim of Northview as due and owing under the terms of this Plan. To the extent provided for under applicable law and the Northview Documents, until the allowed amount of its Secured Claim is paid in full, according to the terms of this Plan, Northview shall, on account of its Secured Claim, retain its secured interest in the Reorganized Debtor's property up to the amount due and owing on the allowed amount of the Secured Claim of Northview. Upon its allowed Secured Claim being fully paid according to the terms of this Plan, any further interests claimed by Northview in the Reorganized Debtor's property shall vest in the Reorganized Debtor free and clear of such interests. At this time, Northview shall cause, by filing the appropriate documentation, the release of its lien. But in the event Northview does not cause the release of its lien, the Reorganized Debtor may, pursuant to 11 U.S.C. § 1142 and after notice and a hearing, take those measures necessary to cause a release of the lien.

Pursuant to 11 U.S.C. § 1123(a)(5)(G), any default or penalties existing on the Effective Date of this Plan shall be deemed waived.

Nothing in this Plan shall compromise or release any recourse Northview may have against the Zaliouks and Suval pursuant to its Northview Documents to the extent provided for under the Northview Loan Documents and applicable law.

**Class 3 – Secured Claim of U.S. Small Business Administration ("SBA").**

On or around December 14, 2021, the Debtor obtained a loan from the SBA. ("SBA Loan"). The SBA Loan was subsequently modified on three separate occasions as follows:

| Date of Modification | Modified Loan Amount |
|---|---|
| January 29, 2022 | $802,200.00 |
| February 24, 2022 | $1,250,000.00 |
| March 11, 2022 | $2,000,000.00 |

12

At this time, the Debtor believes that the approximate sum of $2,000,000.00 is still owed on the SBA Loan. The SBA Loan is guaranteed by the Zaliouks.

To secure its obligation under the SBA Loan, the Debtor granted to the SBA a security interest in substantially all of its personal property including the Debtor's accounts and other rights to payment. ("SBA Security Interest"). A financing statement, regarding the SBA Security Interest was filed with the Ohio Secretary of State on December 3, 2012, and is designated document number OH00259283877. The SBA Security Interest was subordinated by the SBA to the security interest of Northview Capital LLC, whose claim is provided for in Class 2 of this Plan, and the security interest of Franklin Capital Holdings, LLC, whose claim is provided for in Class 4 of this Plan.

On June 6, 2024, the Debtor commenced an Adversary Proceeding in this case against the SBA to avoid the SBA Security Interest. ("Adversary Proceeding"). This Adversary Proceeding is designated case number 24-3039. At the time of the filing of this Plan, the Adversary Proceeding had not been adjudicated by the Court.

**The Claim in this Class is impaired and is entitled to Vote on this Plan.**

<u>Treatment</u>

To the extent that, under the SBA Security Interest, the SBA asserts a secured claim under 11 U.S.C. § 506 in this case whether fully secured or partially secured, such secured claim of the SBA shall be treated as an entirely unsecured claim for purposes of 11 U.S.C. § 506.

The allowed amount of the unsecured claim of the SBA shall be in the sum of any timely proof of claim filed by the SBA, or in such amount as the Bankruptcy Court, upon objection of a party in interest, determines the allowed amount of the unsecured claim of the SBA. The entire allowed amount of the unsecured claim of the SBA shall be dealt with and provided for under Class 10 of this Plan, regarding the treatment of the claims of general unsecured creditors.

Notwithstanding, to the extent the SBA files and asserts a secured claim, whether fully secured or partially secured, the claim of the SBA shall be treated as a secured claim pending a final adjudication in the Adversary Proceeding regarding the secured status of the SBA's claim. Until such time as a final adjudication is made by the Bankruptcy Court, regarding the secured/unsecured status of the SBA's Claim, the SBA shall, to the extent provided for under applicable law and its Loan Documents with the Debtor, maintain its secured interest in the Debtor's property. Notwithstanding, until a final adjudication is made by the Court regarding the secured status of the SBA's claim, the SBA shall not be entitled to receive any distribution under this Plan.

To the extent the Bankruptcy Court determines that the claim of the SBA is a secured claim in this case, whether fully or partially, the Debtor shall treat the secured portion of such creditor's Allowed Secured Claim as follows:

Pursuant to 11 U.S.C. § 1191(c)(1), the Debtor shall pay the present value of the allowed amount of such secured claim. The present value of the allowed amount of such secured claim shall be based upon an amortization of such claim over a period of thirty (30) years at a fixed rate of 10.5%, compounded annually.

Payments on the allowed amount of such secured claim shall be made monthly commencing on the fifth day of month following the Effective Date of the Plan, and continuing each month thereafter, unless such date falls on a Saturday or Sunday, or other federal holiday in which case such payment shall be due on the first business day thereafter.

Any amount remaining due and owing on the allowed amount of the allowed secured claim of the SBA at the completion of the Plan shall not be discharged pursuant to 11 U.S.C. § 1192(1). To the extent provided for under applicable law and its Loan Documents with the SBA, until the allowed amount of its Secured Claim is paid in full, according to the terms of this Plan, the SBA shall, on account of its Secured Claim, retain its secured interest in the Reorganized Debtor's property up to the amount due and owing on the allowed amount of the Secured Claim of the SBA. Upon its allowed Secured Claim being fully paid according to the terms of this Plan, any further interests claimed by the SBA in the Reorganized Debtor's property shall vest in the Reorganized Debtor free and clear of such interests. At this time, the SBA shall cause, by filing the appropriate documentation, the release of its lien. But in the event the SBA does not cause the release of its lien, the Reorganized Debtor may, pursuant to 11 U.S.C. § 1142 and after notice and a hearing, take those measures necessary to cause a release of the lien.

To the extent that the claim of the SBA, or any portion thereof, is adjudicated in the Adversary Proceeding to be an unsecured, the following shall apply:

Upon confirmation of this Plan, any interests or liens in the Debtor's property or property of the estate claimed by the SBA shall be deemed released and void consistent with any judgment entered by the Court in the Adversary Proceeding. To the extent such interests or liens are not released the SBA, the Debtor shall be entitled to seek from the Court an Order declaring said interests and liens as released.

**Class 4 – Secured Claim of Franklin Capital Holdings, LLC ("Franklin").**

Prior to the commencement of the case, the Debtor utilized Franklin to factor its accounts receivable. As a part of this arrangement, the Debtor and Franklin executed a factoring agreement. ("Factoring Agreement").

At the commencement of the Bankruptcy Case, it is believed that Franklin held more or less $32,120.41 in factored accounts.

As a part of the Factoring Agreement, the Debtor granted to Franklin a security interest in substantially all of its personal property including the Debtor's accounts and other rights to payment. ("Franklin Security Interest"). A financing statement, regarding the Franklin Security interest in the Debtor's personal property, was filed with the Ohio Secretary of State on June 19, 2023, and is designated document number OH002738344632. It is believed that the SBA subordinated its interest to that claimed by Franklin in the Debtor's property.

At the time of the filing of this Plan, it is believed that Franklin has collected on substantially all of the accounts the Debtor factored with Franklin.

**The Claim in this Class is Impaired and is entitled to Vote on this Plan.**

Treatment

Under this Plan, Franklin shall be entitled to retain those accounts it factored with Franklin prior to the commencement of the case, and any interest held by the Reorganized Debtor and the bankruptcy estate in such accounts shall be deemed to be abandoned pursuant to 11 U.S.C. § 554.

To the extent Franklin holds any further claim against the Debtor under the Factoring Agreement, such claim shall be deemed to be an unsecured claim, and shall be treated and entitled to the treatment afforded to creditors in Class 10 of this Plan, regarding general unsecured claims.

Any accounts receivable generated by the Debtor after the commencement of the case, shall vest in the Reorganized Debtor free and clear of any interest claimed by Franklin under the Franklin Security Interest and the Factoring Agreement. Based thereon, on the Effective Date of this Plan, Franklin shall cause, by filing the appropriate documentation, the release of its lien. But in the event Franklin does not cause the release of its lien, the Reorganized Debtor may, pursuant to 11 U.S.C. § 1142 and after notice and a hearing, take those measures necessary to cause a release of the lien.

**Class 5 – Putative Secured Claims of those Creditors making Merchant Cash Advances to the Debtor**

Prior to the commencement of the case, the Debtor obtained Merchant Cash Advances, or other similar extensions of credit, from the following creditors: (1) Unique Funding Solutions, LLC; (2) ODK Capital LLC; (3) TVT Capital; and (4) Channel Partners. (Collectively "MCA Creditors"). Each of these creditors filed a UCC-1 Financing Statement, claiming an interest in the Debtor's account receivables. The details of each of debts to these creditors is as follows:

| | Creditor | Claim | Date | UCC |
|---|---|---|---|---|
| a. | Unique Funding | $91,308.63 (Cl. 13) | 9-7-23 | OH00275740504 |
| b. | ODK Capital LLC | $275,935.16 (Cl 15) | 10-31-23 | OH00276986868 |
| c. | TVT Capital | $30,000.00 (est.) | 6-21-23 | OH00274063244 |
| d. | Channel Partners | $175,000.00 (est.) | 3-6-23 | OH00271141065 |

**Claims in this Class are impaired and entitled to Vote on this Plan**.

Treatment

To the extent that any MCA Creditors assert a secured claim in this case, whether fully secured or partially secured, such secured claim of the MCA Creditors, whether from Unique Funding Solutions, LLC, ODK Capital LLC, TVT Capital, or Channel Partners, shall, under this Plan, be treated as an entirely unsecured claim for purposes of 11 U.S.C. § 506.

The allowed amount of the unsecured claim of Unique Funding Solutions, LLC, ODK Capital LLC, TVT Capital, or Channel Partners, as the case may be, shall be in the sum of any proof of claim filed by such MCA Creditors, or in such amount as the Bankruptcy Court, upon objection of a party in interest, determines the allowed amount of the unsecured claim of such creditor. The entire allowed amount of the unsecured claims of the MCA Creditors shall be dealt with and provided for under Class Ten (10) of this Plan, regarding the treatment of the claims of general unsecured creditors.

Notwithstanding, to the extent any MCA Creditors, whether from Unique Funding Solutions, LLC, ODK Capital LLC, TVT Capital, or Channel Partners, asserts a secured claim, whether fully secured or partially secured, the treatment of the claim of such MCA Creditors shall be subject to an adjudication by the Bankruptcy Court as to the secured/unsecured status of any such claim asserted by such creditor. Until such time as a final adjudication is made by the Bankruptcy Court regarding the secured/unsecured status of such MCA Creditors, whether from Unique Funding Solutions, LLC, ODK Capital LLC, TVT Capital, or Channel Partners, such creditor shall, to the extent provided for under applicable law and its Loan Documents with the Debtor, maintain its secured interest in the Debtor's property. Notwithstanding, until a final adjudication is made by the Court regarding the secured status of such creditors' claim, such creditor shall not be entitled to receive any distribution under this Plan.

To the extent the Bankruptcy Court determines that the claim of any MCA Creditors, whether from Unique Funding Solutions, LLC, ODK Capital LLC, TVT Capital, or Channel Partners, is a secured claim in this case, whether fully or partially, the Debtor shall treat the secured portion of such creditor's Allowed Secured Claim as follows:

Pursuant to 11 U.S.C. § 1191(c)(1), the Debtor shall pay the present value of the allowed amount of such secured claim. The present value of the allowed amount of such secured claim shall be based upon an amortization of such claim over a period of ten (10) years at a fixed rate of 10.5%, compounded annually.

Payments on the allowed amount of such secured claim shall be made monthly commencing on the fifth day of month following the Effective Date of the Plan, and continuing each month thereafter, unless such date falls on a Saturday or Sunday, or other federal holiday in which case such payment shall be due on the first business day thereafter.

Any amount remaining due and owing on the allowed amount of the allowed secured claim of such creditor at the completion of the Plan shall not be discharged pursuant to 11 U.S.C. § 1192(1). Further, on the Fifth Anniversary of the Effective Date of this Plan, the amount remaining due and owing on the allowed secured claim of such creditor shall fully mature and balloon so that the remaining balance due on the allowed amount of such creditor's secured

claim shall become immediately due and payable.

To the extent the claim of any MCA Credtiors in this Class, whether from Unique Funding Solutions, LLC, ODK Capital LLC, TVT Capital, or Channel Partners, is determined to be unsecured, the following shall apply:

Upon confirmation of this Plan, any interests or liens in the Debtor's property or property of the estate claimed by a creditor in this Class shall be deemed released and void. To the extent such interests or liens are not released by a creditor in this Class, the Debtor shall be entitled to seek from the Court an Order declaring said interests and liens as released.

Pursuant to 11 U.S.C. §§ 551, 541, and 1141, upon confirmation of the Plan, any and all property, including accounts receivable, received, acquired or generated by the Debtor, commencing from the time this case was commenced, shall vest in the Debtor free and clear of any interest claimed by any creditor in this Class, notwithstanding any contractual claim that such property was purchased by a claimant in this Class prior to the commencement of the case. Furthermore, all claims of creditors in this Class shall be considered recourse claims against Debtor.

## Class 6 – Secured Claim of Cardiff/Amur ("Cardiff")

On June 23, 2023, the Debtor entered into an equipment financing agreement ("Finance Agreement") with Cardiff for the purchase of two items of Machinery used in the Debtor's business operations: (1) a WP-8S-250Z Simplex model/Premade Puch Machine; and (2) a Combo Platform, Bucket Elevator, Timing Hopper. ("Equipment").

The amount financed under the Finance Agreement was $181,000.00. The term of the Finance Agreement is 72 months, with monthly payments of $3,446.00 due under the Finance Agreement. Amur Equipment Finance, Inc. is also a party to the Finance Agreement.

Under the Finance Agreement, Cardiff was granted a security interest in the Equipment, with an UCC-1 financing statement being filed with the Ohio Secretary of State on June 23, 2023, designated document number OH00274063244.

**The Claim in this Class is not Impaired and is not entitled to Vote on this Plan.**

<u>Treatment</u>

At the commencement of the case and at the time of the filing of this Plan, the Debtor was current on its obligation to Cardiff under the Finance Agreement. Under this Plan, the legal, equitable, and contractual rights of Cardiff shall be left unaltered and Cardiff shall be entitled to receive payments on its claim under the same terms and conditions as provided in the Finance Agreement.

To the extent provided for under applicable law and the Finance Agreement Cardiff shall retain its secured interest in the Equipment up to the amount due and owing on its secured claim.

**Class 7 – Secured Claim of Pawnee Leasing Corporation ("Pawnee")**

On September 13, 2019, the Debtor entered into an equipment financing agreement ("Finance Agreement") with Pawnee for the purchase of a BPI CF 250 Cartoner. ("Equipment"). The term of the Finance Agreement is 60 months, with monthly payments of $3,121.00 due under the Finance Agreement.

Under the Finance Agreement, Pawnee was granted a security interest in the Equipment, with an UCC-1 financing statement being filed with the Ohio Secretary of State on September 27, 2019, designated document number OH002343355334. Pawnee filed a proof of claim in this case in the amount of $19,459.75.

**The Claim in this Class is not Impaired and is not entitled to Vote on this Plan.**

**Treatment**

At the commencement of the case and at the time of the filing of this Plan, the Debtor was current on its obligation to Pawnee under the Finance Agreement. Under this Plan, the legal, equitable, and contractual rights of Pawnee shall be left unaltered and Pawnee shall be entitled to receive payments on its claim under the same terms and conditions as provided in the Finance Agreement.

To the extent provided for under applicable law and the Finance Agreement Pawnee shall retain its secured interest in the Equipment up to the amount due and owing on its secured claim.

**Class 8 – Secured Claim of Bapu Almond Company, Inc. ("Bapu").**

Bapu Almond Company, Inc. ("Bapu") filed a proof of claim in this case. (Cl. No. 5). ("Bapu Claim"). The Bapu Claim is asserted in the amount of $165,674.50 and is asserted as fully secured pursuant to the Perishable Agricultural Commodities Act, 7 U.S.C.§ 499e(c).

**The Claim in this Class is Impaired and is entitled to Vote on this Plan.**

<u>Treatment</u>

The Bapu Claim shall be treated as a fully secured, for purposes of 11 U.S.C. § 506(a), in the amount of $36,000.00 ("Bapu Secured Claim"). The Bapu Secured Claim shall attach to the Debtor's property to the same extent and in the same priority provided for under applicable law.

The remaming amount of the Bapu Claim, in the amount of $129,674.50, shall be deemed to be an unsecured claim, and shall be treated and entitled to the treatment afforded to creditors in Class 10 of this Plan, regarding general unsecured claims.

The Debtor shall pay the present value of the Bapu Secured Claim over the three-year length of this Plan by paying interest on the Bapu Secured Claim interest at the rate of 10.5% per

annum. Payments on the Bapu Secured Claim shall be made monthly in the amount of $1,170.09, commencing on the fifth day of the month following the Effective Date of the Plan and continuing on the fifth day of each month thereafter until the Bapu Secured Claim is fully paid. If the fifth day of the month falls on a Saturday or Sunday or other federal holiday, the monthly payment on the Bapu Secured Claim shall be due on the first business day thereafter.

To the extent provided for under applicable, until the allowed amount of the Bapu Secured Claim is paid in full, according to the terms of this Plan, Bapu shall, on account of Bapu Secured Claim, retain its secured interest in the Reorganized Debtor's property up to the amount due and owing on the allowed amount of the Bapu Secured Claim  Upon the Bapu Secured Claim being fully paid according to the terms of this Plan, any further interests claimed by Bapu in the Reorganized Debtor's property shall vest in the Reorganized Debtor free and clear of such interests.

**Class 9 – Secured Claims of not otherwise separately classified**

This Class applies to any allowed secured claim not otherwise separately classified in this Plan.

**The Claims in this Class is Impaired and entitled to Vote on this Plan.**

<u>Treatment</u>

To the extent any creditor not otherwise classified in this Plan holds a secured claim pursuant to 11 U.S.C. § 506, such creditor shall be entitled to the following treatment.

The amount of the secured claim of such creditor shall be in the amount of any timely proof of claim filed by such creditor, or in such amount as the Bankruptcy Court, upon objection of a party in interest, determines the allowed amount of such creditor's claim. Any unsecured portion of such creditor's claim shall be dealt with and provided for under Class 10 of this Plan, regarding the treatment of the claims of general unsecured creditors.

If any party-in-interest objects or otherwise contests the secured status of such creditor's claim, such creditor shall not be entitled to receive any payment under this Plan until a final adjudication is made by the Bankruptcy Court regarding the secured status of such creditor's claim.

Pursuant to 11 U.S.C. § 1191(c)(1), the Debtor shall pay the present value of the allowed amount of any secured claim in this class. The present value of such secured creditor's claim shall be based upon an amortization of such claim over 20 years, at a fixed rate of 10.5%, compounded annually. Payments shall be made on the allowed amount of such secured creditor's claim on a monthly basis, commencing on the 5th day of the month following the Effective Date of the Plan, and continuing on the 5th day of each month thereafter, unless such date falls on a Saturday or Sunday, or other federal holiday in which case such payment shall be due on the first business day thereafter.

Notwithstanding, after 60 months, commencing from the Effective Date, the amount remaining due and owing on any allowed secured claim in this Class shall balloon and become fully due and payable and such creditor shall, at that time, be entitled to enforce all rights it has against the Reorganized Debtor and its Property in accordance with its contractual agreement with the Debtor and applicable law.

Payments on any secured claim allowed in this Class shall be paid by the Debtor notwithstanding that this Plan is not consensually confirmed under 11 U.S.C. § 1191.

Pursuant to 11 U.S.C. § 1191(1), until the amount of any allowed secured claim in this class is fully paid, the Debtor shall not be discharged with respect to the allowed amount of such secured claim as remains due and owing under the terms of this Plan. To the extent provided for under applicable law and any contractual rights of such creditor, until the allowed amount of such creditors claim is paid in full, according to the terms of this Plan, such creditor shall, on account of its secured claim, retain its secured interest in the Reorganized Debtor's property up to the amount due and owing on the allowed amount of such creditor's secured claim.

Upon the allowed amount of any creditor holding an allowed secured claim in this Class being fully paid according to the terms of this Plan, any further interests claimed by such creditor in the Reorganized Debtor's property shall vest in the Reorganized Debtor free and clear of such interests. At this time, such creditor shall cause, by filing the appropriate documentation, the release of its lien. But in the event such creditor does not cause the release of its lien, the Reorganized Debtor may, pursuant to 11 U.S.C. § 1142 and after notice and a hearing, take those measures necessary to cause a release of the lien.

### Class 10 – General Unsecured Claims

This Class consists of all general unsecured claims not otherwise classified or provided for in other provisions in this Plan. Only creditors holding allowed unsecured claims shall, as provided for in 11 U.S.C. § 502(a), be entitled to receive a distribution according to the Treatment provided for in this Class. Subject to the provisions of § 502, untimely claims are disallowed, without the need for formal objection, unless allowed by court order.

**Claims in this Class are impaired and are entitled to Vote on this Plan.**

Treatment

Allowed unsecured claims will be paid pro-rata from the Debtor's Disposable Income, as defined in 11 U.S.C. § 1191(d), after and subject to the payment of those administrative expenses and costs provides for in Article 3 of this Plan. In no event, however, shall allowed claims in this Class, as a group, receive less than the Liquidation Value of the Debtor's assets as provided in attached Exhibit A. No interest shall accrue on any Claims in this Class.

The Debtor's Disposable Income shall be based upon the net income received by the Debtor based upon those cash flow projection as attached hereto as Exhibit B. Based upon these projections, the Debtor's total disposable income over the length of this Plan is $78,887.11.

The Debtor shall make equal monthly payments of its Disposable Income in the amount as follows:

2024 monthly payments: $2,233.73;

2025 monthly payments: $2,185.33;

2026 monthly payments: $2,184.89; and

2027 monthly payments of $2,188.66.

Such payments shall be disbursed, pro-rata, to claimants holding allowed claims. Such payments shall commence by the Reorganized Debtor on the fifth day of the month following the Effective Date of this Plan and shall continue to be made on the first day each month thereafter until completion of the Plan unless such day falls on a Saturday, Sunday or other federal holiday in which case such payment shall be due on the first business day thereafter.

Unless this Plan is consensually confirmed under 11 U.S.C. § 1191(a), payments due in this Class shall be paid by the Debtors to the Trustee for distribution according to the terms set forth herein.

No interest shall accrue on any claim in this Class.

**Class 11 – Equity holders**

This class consists of the outstanding shares of stock held by Yuval Zaliouk and Susan Zaliouk.

**Interests in this Class are impaired and are entitled to Vote on this Plan.**

Treatment

On the Effective Date, except to the extent otherwise provided herein, all issued and outstanding shares of stock in the Debtor in existence at the commencement of the case, including any instruments, certificates, agreements and other documents evidencing or relating to such stock interests shall vest in Tamar Markam and Jason Markham in the following proportions: (1) 51% to Tamar Markham; and (2) 49% to Jason Markham.

## ARTICLE 5: ALLOWANCE AND DISALLOWANCE OF CLAIMS

**5.01: Disputed claim**.

A disputed claim is a claim that has not been allowed or disallowed and as to which either:

(i) A proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or

21

(ii) No proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

<u>Timing of Objections</u>: The Debtor or any party in interest may object to the allowance of any Claim, whether listed on the Schedules filed by Debtors, or filed by any Creditor, on or before the later of 60 days after the Effective Date of the Plan, unless a proof of claim or an amendment to an existing proof of claim is filed more than 30 days after the Effective Date in which case the Debtor or any party in interest shall be required to file an objection to such claim within 60 days after the filing of such claim or amendment thereto.

**5.02: Delay of distribution on a disputed claim.**

No distribution will be made on account of a disputed claim unless and until it is allowed.

**5.03 Settlement of disputed claims.**

The Debtors will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Federal Rule of Bankruptcy Procedure 9019.

**5.04 Full Payment of Small Claims**

In its discretion, the Debtor shall have the right to fully pay, in one lump sum, any claim under this Plan where the total amount due to such claimant under this Plan is $500.00 or less.

## ARTICLE 6: PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

(a) Unless specifically rejected prior to confirmation of this Plan, the Debtors assume, and if specified assigns, the following executory contracts and unexpired leases as of the Effective Date of the Plan:

(1) De Lage Laden Financial Services-60 Month Lease, with purchase option, for a Bowlift, with Debtor as lessee. Under this assumption, no cure is necessary

(2) Miami Industrial Trucks- Lease commencing 5-10-2021 and ending 12-10-24, for a Forklift with Debtor as lessee.  Under this assumption, no cure is necessary

(3) Wells Fargo- 60 month lease, with purchase option, of AIR Compressor, with Debtor as lessee. Under this assumption, no cure is necessary.

(4) Suval Investments LLC-Lease of Real Property at 1930 Indian Wood Circle, Maumee, Ohio, with Debtor as lessee. Under this assumption, no cure is necessary.

 (b) Except for executory contracts and unexpired leases that have been assumed, and if applicable assigned, either before the Effective Date or under Article 6(a) of this Plan, or that are the subject of a pending motion to assume, and if applicable assign, the Debtors will be

22

conclusively deemed to have rejected all executory contracts and unexpired leases as of the effective date. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than 45 days after the date on which the Bankruptcy Court enters the order confirming this Plan.

## ARTICLE 7: MEANS FOR IMPLEMENTATION OF THE PLAN

The Plan will be implemented and funded through the future business operations of the Debtor. The Debtor may also seek to obtain post-confirmation financing, but this is not expected in the short term. As a part of its reorganization, the Debtor does not contemplate the sale of any assets except that assets may be sold to the extent that it is later determined they are no longer of a value to the Debtor's business operation or their useful life for the Debtor has expired. The Debtor is also contemplating finding a third party, potentially a customer, to make a capital contribution to the company in exchange for an equity stake in the Reorganized Debtor. However, no party has yet been identified that will make such a capital contribution and such action is not contemplated in the short term.

Order of Distribution: Funds contributed to the Plan from the above sources shall be disbursed in the following order of priority:

(1) Payment of allowed Administrative Expenses as provided in Section 3.02;

(2) Payment of Priority Tax Claims provided in Section 3.03;

(3) Payment of Priority Claims provided in Section 4.01;

(4) Payment to those creditors, on a pro-rata basis, holding allowed claims in Class 10 of the Plan.

Section 1129(a)(5) Disclosure-The following is disclosed pursuant to 11 U.S.C. § 1129(a)(5):

Mr. and Mrs. Zaliouk will continue to serve as officers of the Reorganized Debtor. Neither shall receive any compensation for their services as directors and officers of the Debtor during the length of this Plan.

Tamar Markham will continue to serve as CEO of the Reorganized Debtor and will receive an annual salary of $75,000.00. No other benefits will be provided to Tamar Markham.

Jason Markham will continue to serve as Executive VP of the Reorganized Debtor and will receive compensation based soley upon commission, with Mr. Markham's commission constituting 5% of any new sale orders. No other benefits will be provided to Jason Markham.

No other insiders will be employed by the Debtor.

The Debtor expects to have sufficient cash on hand to make the payments required on the Effective Date and/or the 5th day of the month following the Effective Date. For this purpose,

the Debtor expects to have cash on hand of approximately $20,000.00 and receipts and due receivables of approximately $120,000.00 between the time of the Confirmation Date and the Effective date of the Plan, 30 days later. Said funds are sufficient to commence making those payments as provided for in this Plan.

To the extent there are not sufficient funds to make these required payments, one or more of the Debtor's principals will make upon for any deficiency from their personal assets.

## ARTICLE 8: VESTING

Pursuant to 11 U.S.C. § 1141(b), on Confirmation of the Plan all property of the estate will revest in the Reorganized Debtor, except as otherwise provided in the Plan or the Confirmation Order.

Pursuant to 11 U.S.C. § 1141(c), on Confirmation of the Plan, all property of the Debtor dealt with in the Plan, tangible and intangible, including, without limitation, licenses, furniture, fixtures and equipment, receivables and cash will revert, free and clear of all Claims and Interests claimed against the Debtor's property except as otherwise provided in the Plan or the Confirmation Order.

## ARTICLE 9: CLAIMS OF DEBTOR

### 9.01 Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtor, whether arising before or after the Petition Date, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved Notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtor pursuant to the releases and exculpations contained in the Plan, which shall be deemed released and waived by the Debtor and the Reorganized Debtor as of the Effective Date.

## ARTICLE 10: GENERAL PROVISIONS

### 10.01 Definitions and rules of construction.

The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan, and they are supplemented by the following definitions:

**Administrative Claimant**: Any person entitled to payment of an Administration Expense.

24

**Administrative Convenience Class:** A class consisting of every unsecured claim that is less than or reduced to an amount that the Bankruptcy Court approves as reasonable and necessary for administrative convenience.

**Administrative Expense**: Any cost or expense of administration of the Chapter 11 case entitled to priority under Section 507(a)(2) of the Code and allowed under Section 503(b) of the Code, including without limitation, any actual and necessary expenses of reserving the Debtor's estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor-in-Possession, allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, the allowed claim of the Trustee for fees and/or reimbursements, and any fees or charges assessed against any of the Debtor's estates under Chapter 123, Title 28, United States Code.

**Administrative Tax Claim**: Any tax incurred pursuant to Section 503(b)(1)(B) of the Code.

**Allowed Claim**: Except as otherwise specified in this Plan, any claim against the Debtor pursuant to Section 502 of the Code to the extent that: (a) a Proof of Claim was either timely filed or was filed late with leave of the Bankruptcy Court or without objection by the Debtor, and (b) as to which either (i) a party in interest, including the Debtor, does not timely file an objection, or (ii) is allowed by a Final Order.

 **Allowed Priority Tax Claim**: A Priority Tax Claim to the extent that it is or has become an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled on the Confirmation Date.

**Allowed Secured Claim**: Except as otherwise specified in this Plan, Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code

**Allowed Unsecured Claim**: An Unsecured Claim to the extent it is, or has become, an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled on the Confirmation Date.

**Bankruptcy Code or Code**: The Bankruptcy Reform Act of 1978, as amended and codified as Title 11, United States Code.

**Bankruptcy Court**: The United States Bankruptcy Court for the Northern District of Ohio.

**Bankruptcy Rules**: The Federal Rules of Bankruptcy Procedure.

**Cash**: Cash, cash equivalents and other readily marketable securities or instruments issued by a person other than the Debtors, including, without limitation, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks and commercial paper of any entity, including interest accrued or earned thereon.

**Chapter 11 Case**: This case under chapter 11 of the Bankruptcy Code in which the Debtor, YZ Enterprises Inc., is the Debtor-in-Possession.

**Claim**: Any "right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).

**Class**: A category of holders of claims or interests which are substantially similar to the other claims or interests in such class.

**Confirmation**: The entry by the Bankruptcy Court of an order confirming this Plan.

**Confirmation Date**: The Date upon which the Bankruptcy Court shall enter the Confirmation Order; provided however, that if on motion the Confirmation Order or consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be the entry of the Final Order vacating such stay or the date on which such stay expires and is no longer in effect.

**Confirmation Order**: An order of the Bankruptcy Court or any amendment thereto confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

**Creditor**: Any person who has a Claim against the Debtor that arose on or before the Petition Date.

**Debtor** and **Debtor-in-Possession**: The Debtor, YZ Enterprises, Inc., the debtor-in-possession in this Chapter 11 Case.

**Disposable Income**: Shall have that meaning ascribed to such term under § 1191(d) of the Code

**Disputed Claim:** Any claim against the Debtor pursuant to Section 502 of the Code that the Debtor has in any way objected to, challenged or otherwise disputed or which is subject to continuing litigation.

**Distributions**: The property required by the Plan to be distributed to the holders of Allowed Claims.

26

**Equity Interest**: An ownership interest in the Debtor.

**Executory Contracts**: All unexpired leases and executory contracts as described in Section 365 of the Bankruptcy Code.

**Final Order**: An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

**Petition Date**: May 31, 2024, the date the chapter 11 petition for relief was filed.

**Plan**: This Plan, either in its present form or as it may be altered, amended, or modified from time to time.

**Priority Tax Claim**: Any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

**Reorganized Debtor**: The Debtor after the Effective Date.

**Schedules**: Schedules and Statement of Financial Affairs, as amended, filed by the Debtors with the Bankruptcy Court listing liabilities and assets.

**Total Disposable Income:** means that income which, pursuant to Exhibit B, the Debtors have calculated its income to be for purposes of 11 U.S.C. § 1181(d).

**Trustee**: Patricia Fugee, the trustee appointed pursuant to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. 1183(b), the Plan, or the order confirming the Plan.

## 10.02 Effective Date.

The Effective Date of this Plan is the day that is 30 days after the entry of the Confirmation Order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the day after the date on which the stay expires or is otherwise terminated. These periods are calculated as provided in Federal Rule of Bankruptcy Procedure 9006(a)(1).

## 10.03 Severability.

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

## 10.04 Binding effect.

The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

**10.05 Captions.**

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**10.06 Controlling effect.**

Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Ohio govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**10.07 Corporate governance**.

Upon confirmation, the Board of Directors shall promptly take the required action to amend the debtor's charter to include provisions prohibiting the issuance of nonvoting stock, and providing, as to the several classes of securities possessing voting power, fair and equitable distribution of such power among such classes, including, in the case of any class of stockholders having a preference over another class of stockholders with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends.

**10.08 Retention of Jurisdiction**

The Bankruptcy Court confirming the Plan shall retain jurisdiction to the full extent necessary to administer this case after Plan confirmation and to adjudicate any related adversary proceedings or contested matters, including those relating to the Plan, such as concerning the Plan's construction, implementation, or modification. Neither this provision nor anything in this Plan constitutes a limitation on or an expansion of the jurisdiction authorized by title 28 of the United States Code.

## ARTICLE 12: DISCHARGE

If the Debtor's Plan is confirmed under § 1191(a), on the Effective Date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code. The Debtor will not be discharged from any debt:

(i)       imposed by this Plan; or

(ii)      (ii) excepted from discharge under § 523(a) of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

If the Debtor's Plan is confirmed under § 1191(b), confirmation of the Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the first 3 years of this Plan, or as otherwise provided in § 1192 of the Code. The Debtor will not be discharged from any debt:

28

(i) on which the last payment is due after the first 3 years of the Plan, or as otherwise provided in § 1192; or

(ii) excepted from discharge under § 523(a) of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

Third-Party Release-Nothing in this Plan shall be construed to release or discharge any third party, including the Zaliouk's and Suval, from any liability for any claim in this case

## ARTICLE 13: PAYMENTS

Unless specified otherwise in the Plan, if the Plan is confirmed under §1191(a), payments due under the Plan shall be made by the Debtor to the Trustee for distribution to Creditors provided for in the Plan and pursuant to §1194(a) of the Code. Once the Trustee's service is terminated under § 1183(c), the Debtors shall make Plan payments except as otherwise provided in the Plan or in the order confirming the Plan.

If the Plan is confirmed under section § 1191(b), except as otherwise provided in the Plan or in the order confirming the Plan, the Debtor shall make all payments to the Trustee for distribution to Creditors provided for in the Plan pursuant to §1194(b) of the Code.

## ARTICLE 14: LENGTH OF PLAN

Unless otherwise ordered by the Bankruptcy Court, the length of this Plan shall be three years, commencing on the Effective Date.

## ARTICLE 15: REMEDIES IN EVENT OF DEFAULT UNDER PLAN

If the Debtor fails to make payments and distributions as required under the Plan, any creditor or party in interest may seek to have this case converted to a proceeding under Chapter 7 of the United States Bankruptcy Code, seek dismissal of this case under 11 U.S.C. § 1112 or seek any other remedy provided by law or in the Plan.

## ARTICLE 16: TAX CONSEQUENCES OF PLAN

The Plan and the resulting tax consequences may be complex, and the tax consequences of the Plan will depend upon certain factual determinations. No ruling has been or will, prior to the Effective Date, be requested from the Internal Revenue Service regarding the tax consequences of the Plan. No assets of the Debtor have been sold or transferred since the filing of this case and as a result, no tax consequences as to such assets have arisen since the filing of this case. However,

**BECAUSE THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND MAY VARY BASED ON INDIVIDUAL CIRCUMSTANCES THIS DISCLOSURE STATEMENT RENDERS NO TAX ADVICE ON THE TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN TO ANY PARTICULAR CREDITOR, TO THE**

**DEBTOR, OR TO INTEREST HOLDERS. EACH PARTY IS URGED TO CONSULT HIS OR HER TAX ADVISOR AS TO THE TAX CONSEQUENCES OF THE PLAN TO HIM OR HER INCLUDING ANY CONSEQUENCES UNDER STATE OR LOCAL TAX LAWS**.

The following constitutes a summary of the potential tax consequences which may arise upon confirmation of the Plan.

1. Tax Consequences to the Debtors.

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD Income") realized during the taxable year, which generally includes the amount of principal debt discharged and any interest that has been previously accrued and deducted for tax purposes but remains unpaid at the time the indebtedness is discharged. The Tax Code permits a debtor in bankruptcy to exclude its COD Income from gross income, but requires the debtor to reduce certain tax attributes by the amount of the excluded COD Income. It is likely that the Debtors will realize a significant amount of COD Income upon the consummation of the Plan. The Debtor will not be required to include COD Income in gross income because the indebtedness will be discharged while the Debtors are under the jurisdiction of a court in a Title 11 case.

2. Certain U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests

The U.S. Federal Income Tax consequences to holders of allowed claims arising from the distributions to be made in satisfaction of their claims pursuant to a bankruptcy plan of reorganization may vary, depending upon, among other things: (a) the type of consideration received by the holder of a claim in exchange for the indebtedness it holds; (b) the nature of the indebtedness owed to it; (c) whether the holder has previously claimed a bad debt or worthless security deduction in respect of its claim against the corporation; (d) whether such claim constitutes a security; (e) whether the holder of a claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. federal income tax on a net income basis; (f) whether the holder of a claim reports income on the accrual or cash basis; and (g) whether the holder of a claim receives distributions under the bankruptcy plan in more than one taxable year. For tax purposes, the modification of a claim may represent an exchange of the claim for a new claim, even though no actual transfer takes place. In addition, where a gain or loss is recognized by the holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the claim constitutes a capital asset in the hands of the holder and how long it has been held or is treated as having been held, whether the claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction with respect to the underlying claim.

Internal Revenue Service Circular 230 Notice: To ensure compliance with Internal Revenue Service Circular 230, holders of Claims and Equity Interests are hereby notified that: (A) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Equity Interests

for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (B) such discussion is written in connection with the promotion or marketing by the Debtor of the transactions or matters addressed herein; and (C) holders of Claims and Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.

Dated: 8-19-2024                    */s/Tamar Markham*
                                     Tamar Markham
                                     CEO